1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9           FOR THE EASTERN DISTRICT OF CALIFORNIA

10   KONOLUS I. SMITH,

11          Petitioner,                    No. CIV S-10-730 FCD CHS

12      vs.

13   J.W. HAVILAND,

14          Respondent.        FINDINGS AND RECOMMENDATIONS

15   _____/

16                         I.  INTRODUCTION

17          Petitioner Smith, a state prisoner, proceeds pro se with a petition for writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner stands convicted of corporal injury to a

19   spouse and making criminal threats in the El Dorado County Superior Court, case number

20   S07CRF0275, for which he is currently serving two concurrent indeterminate prison sentences of

21   25 years to life.

22                         II.  BACKGROUND[1]

23          Petitioner and the victim, P., had been married for 15 years at the time of the

24   offenses.  P. testified that theirs "was not the best of relationships."  In August 2007, P. consulted

25   _____

26   [1] *See People v. Smith*, No. C058272, 2009 WL 1449014, at 1 (Cal. App. Third Dist., 2009).

                                      1

a divorce attorney.  Dissolution proceedings were underway at the time of trial.

On August 28, 2007, the two argued and discussed a divorce.  Petitioner appeared to agree to the idea of a divorce.

Sometime during that night, P. awoke from bed when she heard noises in the kitchen.  She saw petitioner going from room to room.  He came back into the bedroom, straddled her, held scissors over her, and said, "Tonight's the night you're going to die, bitch." Petitioner touched the scissor blades to her eyelids and throat.  He forced her to swallow various pills, including Benadryl, Advil, and Ibuprofen.  He warned her that he would stab her once for every pill she spit out.  He added that he would stab her if she made any noise or tried to get away.  He threatened to throw hot grease on her face, so she could "[s]ee if [her] boyfriend would like [her] then."  Petitioner bound P.'s feet and hands with a wool scarf and a belt from a bathrobe.

At some point petitioner dragged P. into the hallway bathroom, where he continued to force pills down her throat.  He said he would tell her family that she had committed suicide because she was upset about her affair.  P. eventually lost consciousness and woke up in a hospital.

Petitioner told the emergency room nurse that P. had possibly overdosed on Tylenol PM.  He told an El Dorado County Sheriff's Deputy that he saw her take one-half of a "blue pill" at 10:00 p.m. before they both went to bed, and that he found P. on the bathroom floor around 8:00 a.m. the following morning next to three pill bottles.

When P. regained consciousness, she was in the intensive care unit. A nurse told her she was in the hospital because she had tried to commit suicide.  P. summoned the police and explained that petitioner had tried to kill her by forcing her to swallow medication. Various injuries were observed on her, including an injury on her neck and bruises on her wrists.

P. was released from the hospital the next day.  Following a pretext phone call, petitioner told her, "I fucked up.  I fucked up all the way."  He also apologized to her and said,

1    "Sorry.  Ain't no words."

2          Petitioner was charged with attempted murder (count I), false imprisonment

3    (count II), infliction of corporal injury on a spouse (count III), and threatening to commit a crime

4    that would result in death or great bodily injury (count IV).  A jury convicted him of counts III

5    and IV; for reasons that will be discussed herein, the trial court declared a mistrial on counts I

6    and II.  Petitioner admitted that he had incurred two prior serious felonies alleged for sentence

7    enhancement purposes.  The court imposed a sentence of two concurrent indeterminate terms of

8    25 years to life.

9          The California Court of Appeal, Third District, affirmed the judgment and

10   sentence.  A petition for review to the California Supreme Court was denied.

11                          III.  GROUNDS FOR RELIEF

12          The petition sets forth four distinct grounds for relief.  Each will be separately set

13   forth and discussed herein.[2]

14   Ground One:  The trial court's denial of the defense's motion to dismiss Juror No. 6 for

15   alleged bias deprived petitioner of his constitutional rights;

16   Ground Two:  Misconduct by Juror No. 6 during deliberations further deprived petitioner

17   of his constitutional rights;

18   Ground Three: Irregularities in the taking of the verdicts and the trial court's coercion of

19   one juror rendered the verdicts received incomplete and not unanimous, and

20   Ground Four: The trial court abused its discretion  in denying petitioner's motion to

21   dismiss one of his prior serious felony convictions at sentencing.

22

23          [2] Within grounds one through three, petitioner additionally alleges that trial counsel
rendered ineffective assistance by failing to lodge specific statutory and constitutional objections
24   to the claimed errors raised in those grounds. Petitioner was allowed to present each of these
claims on direct appeal; no one was found to be barred for trial counsel's failure to lodge a
25   proper objection; they were denied on the merits in that proceeding as it is recommended that
they be denied on the merits here. *See People v. Smith*, *supra*.  As a result, petitioner cannot
26   establish the requisite prejudice for a claim of ineffective assistance. *See Strickland v.
Washington*, 466 U.S. 668, 693-94 (1984).

IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. §2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)). This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999).  Under AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

This court looks to the last reasoned state court decision in determining whether the law applied to a particular claim by the state courts was contrary to the law set forth in the cases of the United States Supreme Court or whether an unreasonable application of such law has occurred.  *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002), *cert. dismissed*, 538 U.S. 919.  The state court's factual findings are presumed correct if they are not rebutted with clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Taylor v. Maddox*, 336 F.3d 992, 1000 (9th Cir. 2004).  It is the habeas corpus petitioner's burden to show the state court's decision was either contrary to or an unreasonable application of federal law. *Woodford v. Visciotti*, 537 U.S. 19, 123 S. Ct. 357, 360 (2002).

/////

4

## V.  DISCUSSION

A.      Ground One: Juror Bias and the Trial Court's Denial of the Motion to Discharge Juror No. 6

Petitioner claims that the trial court erred in violation of his rights under the Sixth Amendment and the Due Process Clause when it denied his motion to dismiss Juror No. 6, whom he claims intentionally concealed material information during jury voir dire.

During voir dire, before Juror No. 6 was called into the juror box, the trial court asked jurors in the panel several questions, specifying that the questions were for those "on the panel right now – I'm talking about these 18 people.  I'd like the rest of you to listen to these questions."  (Second Augmented Reporter's Transcript of Proceedings ("2 Aug. RT") at 7.)  The court asked "Of the people in the panel right now, have any of you read or heard anything about this case, either through the radio or Internet or the local newspaper of going down to the coffee shop and talking to people and overhearing what's going on?"  (2 Aug. RT at 10-11.)  Two jurors indicated they had read about the case in the paper; in response to further questioning, they said they could put aside what they had read.  No one reported being acquainted with petitioner.

Later that day, Juror No. 6 was called into the jury box.  Juror No. 6 introduced himself: "I have three children, grown.  I'm retired New York City police Lieutenant.  My wife is a retired teacher.  I've lived here for five years, and they never let me serve on [a] jury."  (2 Aug. RT at 72-73.)  Subsequently, the court stated to all jurors in the box:

> I'm going to assume all the newcomers have heard all the questions
> of all the people.  Anyone in that new batch who has any problem?
> Any kind of red flag goes up, or anything you think I should know
> or Mr. Smith should know about you, outside the fact we have a
> retired lieutenant [from the] police department.

(2 Aug. RT at 76.)  Juror No. 6 did not bring anything to the court's attention.  Defense counsel asked the group "Have any of you read the paper about this particular case?"  There was no affirmative response.  Jury selection concluded shortly thereafter, with Juror No. 6 seated on the jury.  The jury was sworn in at 3:35 p.m.  Opening statements were heard after which the jury

1   was excused for the day.

2            First thing the next morning, proceedings resumed in chambers with counsel,

3   petitioner, and Juror No. 6.  The following discussion took place:

4            THE COURT: ...[Juror No. 6], it came to my attention that you
            told someone on the staff that you and your wife know the victim
5            in this case?

6            [JUROR NO. 6]: I do not personally.  My daughter Kathleen and
            Evan lived about two doors, three doors away from this gentleman.
7            [¶] They had two little boys about that time, a four-year old and a
            newborn; Roca, the Huskey; and the black lab.

8
            THE DEFENDANT: Oh, yeah.
9
            [JUROR NO. 6]: And they knew this gentleman as Smitty, as their
10           neighbor. [¶] They've also had probably much more interest than
            me – I just got back from Florida. [¶] We have a place in Florida,
11           and we have been there for two months.  So been out of the loop.
            [¶] I've heard it said that there was a previous incident where he
12           had been charged with a similar crime.  What it was, and how it
            came about, and what the outcome was, I don't know. [¶] I said, "I
13           don't want to hear it.  I don't want to it hear it," [sic] because, you
            know, it could prejudice, of course, how you feel about an
14           individual. [¶] Other than that, I said the only thing that the
            neighbors knew about him was he was a charming man. [¶] You
15           know, I had seen – I had seen him, but never really met him. [¶] I
            remember commenting, "Geez.  There's a black actually living in
16           this neighborhood." [¶] When we were first living there, Meyers
            was the redneck area which we found out it wasn't.  It's a lovely
17           place to live. [¶] Do we know him?  Do we know people that do
            know anybody?  I live on Mohican which is about three blocks
18           from his home.

19           THE COURT: Have you discussed any of this with the other jurors
            or mentioned any of this?
20
            [JUROR NO. 6]: Nothing.  No.
21
            THE COURT: [Defense counsel,] Any questions of [Juror No. 6]?
22
            [DEFENSE COUNSEL]: No.  But I do appreciate your candor sir,
23           more than you know. [¶] No, I don't think I have any questions.
            [Mr. Prosecutor], do you?
24
            [PROSECUTOR]: Do you know anything about the facts of this
25           incident which is alleged to have occurred on August the 29th?

26   /////

6

[JUROR NO. 6]: No.  What do you hear?  You know, death by Tylenol?  No.  I have never heard – probably, I have read articles in the paper. [¶] I do get the <u>Tribune</u>. [¶] I haven't gotten it since I got back because we got back on Sunday.  We haven't reviewed the paper yet. [¶] I do subscribe to it and usually did read it.  It didn't have a big impact, like following a major case on it.

[DEFENSE COUNSEL]: I'm a little concerned, though, because of the mention of the priors.

THE COURT: Well, it's a prior incident.

[DEFENSE COUNSEL]: That's what I'm saying, the prior incident.

THE COURT: What did you hear about the prior incident?

[JUROR NO. 6.] That – it's – I don't know if it's a rumor or what, that possibly he had been charged previously with an attempted murder or something.

THE COURT: How did you find that out?  How did you hear that?

[JUROR NO. 6]: From people that live in the proximity.  My daughter, basically.

THE COURT: Okay.  Okay.  Thank you.

[PROSECUTOR]: Can I ask one more question?

THE COURT: Sure.

[PROSECUTOR]: You're a retired lieutenant from the Police Department?

[JUROR NO. 6]: Uh-huh.

[PROSECUTOR]: Is – can you separate that rumor that you heard about from your judgment on this case?

[JUROR NO. 6]: You know, I can very easily because you were throwing around cliches.  Basically, you can indict a ham sandwich.  What it was, what it was about, like I told my daughter, don't say – whether or not they even know, I don't know. [¶] And yeah, I mean, I have no real leanings one way or another.  I mean, I would – I can be fair.  You know?  I have been through many court cases and know, you know, a lot about the judicial system.  But that's basically, could I?  Yes.

[PROSECUTOR]: Thank you.  I've got nothing else, Judge.

1   (Reporter's Transcript of Proceedings ("RT") at 25-28.)  And further:

2            [JUROR NO. 6]: There was one other thing that had come up.  But
             it was that there was a an issue [sic], I know about the defense
3            wanting to sort of change a venue.

4            [DEFENSE COUNSEL]: What?

5            [JUROR NO. 6]: That might be – that might be just rumor, too.

6            THE COURT: I don't know anything about a change of venue.

7            [JUROR NO. 6]: You're not getting it from a horse's mouth. [¶]
             Somebody said they were trying to get a change of venue because
8            he felt how fair could a jury be in Tahoe. [¶] I always take
             everything people say, you know either face value, grain of salt,
9            whatever...

10   (RT at 29.)

11        Defense counsel moved to disqualify Juror No. 6; the motion was denied.  The

12   trial court stated:  "I'm satisfied with Juror No. 6's responses that he would do his best to be fair

13   and impartial in this case.  He said he would. [¶]  He said – from his previous – they weren't

14   actually contacts, but his previous knowledge of Mr. Smith, he thought he was an okay guy."  (2

15   Aug. RT at 30.)

16        On direct review, the California Court of Appeal rejected petitioner's claim of

17   error premised on Juror No. 6's alleged bias:

18            We find no error, constitutional or otherwise, in the trial court's
             failure to remove Juror No. 6.
19

20            "Although intentional concealment of material information by a
             potential juror may constitute implied bias justifying his or her
21            disqualification or removal [citations], mere inadvertent or
             unintentional failures to disclose are not accorded the same
22            effect.... [¶] Whether a failure to disclose is intentional or
             unintentional and whether a juror is biased in this regard are
23            matters within the discretion of the trial court. Except where bias is
             clearly apparent from the record, the trial judge is in the best
             position to assess the state of mind of a juror or potential juror on
24            voir dire examination. [Citations.]" (*People v. McPeters* (1992) 2
             Cal.4th 1148, 1175, abrogated by statute on another point as
25            recognized in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096,
             1106-1107.)

26

As to Juror No. 6's failure to mention at the outset that he had read about the case in the newspaper, the record supports an implied finding that Juror No. 6's failure was not intentional. Juror No. 6 was examined shortly before the evening recess. At the hearing the following morning, Juror No. 6 acknowledged he did "get the Tribune" and he "probably" had "read articles in the paper." However, he had been out of town and had not reviewed the paper for two months; anything he had read had not made "a big impact" upon him. Because Juror No. 6 corrected the omission at his earliest opportunity, the court could find that his failure to recall that he probably had read articles about the matter had not been intentional or indicative of bias.

As to [Juror No. 6]'s failure to mention that his daughter knew defendant, the record again supports an implied finding that the failure was not intentional. The original prospective jurors had been asked whether they had heard about the case in conversation or through the newspaper; the two who had answered affirmatively also stated they could put aside the outside information. When Juror No. 6 was seated later in the day, he was asked whether any "red flag goes up" or whether he believed he had information that the court or defendant should know. Juror No. 6 could have deduced that, in lieu of raising a red flag, he needed simply to put aside the outside information as the other jurors said they would do. (Cf. *People v. Castaldia* (1959) 51 Cal.2d 569, 570-572 [jurors made denials of bias that were patently false and could not reasonably have resulted from mere inadvertence]; *People v. Diaz* (1984) 152 Cal.App.3d 926, 930-931, 936 [juror failed to timely disclose relevant information despite specific, pointed voir dire questions]; *People v. Blackwell* (1987) 191 Cal.App.3d 925, 928 [same].)

As to [Juror No. 6']s failure to mention that he knew about defendant's prior attempted murder charge, which he learned about from his daughter, defendant's claim that Juror No. 6 "did not follow the court's admonition not to discuss the case with others" fails. This claim presumes that Juror No. 6 acquired at least some of his information after, rather than before, the court issued its admonition. However, the record does not demonstrate when that information was acquired. Defendant therefore cannot use Juror No. 6's knowledge of this fact to show that the juror disobeyed the court's admonition not to talk about the case with anybody.

Finally, the court credited Juror No. 6's assurance that he could be fair and impartial. The court was in the best position to make that determination, and we will not second-guess this credibility determination on appeal. (*People v. McPeters, supra,* 2 Cal.4th at p. 1175; cf. *In re Hitchings* (1993) 6 Cal.4th 97, 116 [witnesses contradicted juror's account of voir dire and court accepted the witnesses' accounts].)

9

1        On this record, there was no abuse of discretion or violation of
defendant's constitutional rights in the failure to discharge Juror

2        No. 6. (*People v. McPeters, supra,* 2 Cal.4th at p. 1175.)

3 *People v. Smith*, *supra*, at 4-5.

4        The Sixth Amendment guarantees criminal defendants a verdict by impartial and

5 indifferent jurors.  *Irvin v. Dowd*, 366 U.S. 717, 722 (1961); *see also Turner v. State of*

6 *Louisiana*, 379 U.S. 466, 471-72 (1965) (holding that due process requires same).  Actual juror

7 bias is the existence of a state of mind that leads to an inference that the person will not act with

8 entire impartiality.  *Fields v. Brown*, 503 F.3d 755, 767 (9th Cir. 2007).  "Actual bias is typically

9 found when a prospective juror states that he can not be impartial, or expresses a view adverse to

10 one party's position and responds equivocally as to whether he could be fair and impartial despite

11 that view."  *Id*.  Bias can also be shown by a juror's dishonesty.  "[T]o obtain a new trial based

12 on juror untruthfulness during voir dire..., a party must first demonstrate that a juror failed to

13 answer honestly a material question on voir dire, and then further show that a correct response

14 would have provided a valid basis for a challenge for cause."  *McDonough Power Equip. v.*

15 *Greenwood*, 464 U.S. 548, 556 (1984); *see also Fields*, 503 F.3d at 766-67.  The focus is on the

16 juror's truthfulness; a "mistaken, though honest, response to a question" will not demonstrate

17 bias.  *See Id.* at 555.  But even a dishonest answer may not be fatal if a juror can act impartially.

18 *See Id.* at 555-56.[3]

19

20      [3] In exceptional circumstances, the Ninth Circuit has also analyzed juror bias under a
theory of implied bias. *See*, *e.g.*, *Estrada v. Scribner*, 512 F.3d 1227, 1239-40 (9th Cir. 2008).

21 Putting aside for the sake of simplicity the question whether the theory of implied juror bias has
been clearly established by the United States Supreme Court for AEDPA purposes, it is clear that
this case is not one in which exceptional circumstances warrant a finding of implied bias.  *See*

22 *Id.*; *Fields*, 503 F.3d at 768, ("Although the Supreme Court has not explicitly adopted (or
rejected) the doctrine of implied bias, both concurring opinions in *McDonough* seem to embrace

23 it... and our court has inferred and presumed bias on rare occasions." (internal citations and
footnotes omitted)); *Dyer v. Calderon*, 151 F.3d 970, 981-82 (9th Cir. 1998) (en banc)

24 (describing the kind of extreme circumstances that could give rise to a finding of implied bias,
such as if a juror turned out to have been a witness to the crime or if a juror turned out to be the

25 prosecutor's brother); *McDonough Power Equip., Inc.*,464 U.S. at 556-57 (Blackmun, Stevens
and O'Conner, JJ., concurring in the judgment); *Id*. at 558 (Brennan and Marshall, JJ.,

26 concurring in the judgment); *Phillips*, 455 U.S. at 222 (O'Connor, J., concurring).

1    "Impartiality is... a state of mind [for which] the Constitution lays down no

2   particular tests and procedure is not chained to any ancient and artificial formula." *Irvin*, 366

3   U.S. at 724-25.  Jurors need not "be totally ignorant of the facts and issues involved." *Id*. at 722.

4   The constitutional standard for juror impartiality requires only that the juror be able to "lay aside

5   his impression or opinion and render a verdict based on the evidence presented in court." *Id*. at

6   723; *see also Patton v. Yount*, 467 U.S. 1025, 1037 n.12 (1984).  Whether a juror can in fact do

7   that is a factual determination to which federal habeas corpus courts owe special deference and

8   must accord a "presumption of correctness." *See* 28 U.S.C. § 2254(e)(1); *Hamilton v. Ayers*, 583

9   F.3d 1100, 1107 (9th Cir. 2009) (citing *Thompson v. Keohane*, 516 U.S. 99, 111 (1995) (noting

10   requirement that presumptive weight be accorded to a trial court's resolution of factual issues,

11   including juror impartiality, because the resolution of such issues "depends heavily on the trial

12   court's appraisal of witness credibility and demeanor")).

13    Under this demanding standard, petitioner's claim fails.  First, the state court

14   accurately noted that the record does not demonstrate when Juror No. 6 had the discussion with

15   his daughter.  In addition, contrary to petitioner's assertion, Juror No. 6 was not explicitly asked

16   during voir dire whether he knew petitioner or whether he knew anything about the case.  The

17   state court's determination that Juror No. 6 might have independently decided that he was

18   capable of putting any outside information out of his head in response to the trial court's query

19   about any problem or "red flag" was reasonable.  It does not appear that Juror No. 6's omission

20   in this regard was actually dishonest.  *See McDonough Power Equip., Inc.*, 464 U.S. at 556;

21   *Hamilton v. Ayers*, 583 F.3d at 1107 (no juror bias when omissions on voir dire were

22   inadvertent); *c.f. Dyer v. Calderon*, 151 F.3d 970, 979 (9th Cir. 1998) (en banc) (biased juror

23   "plainly lied" during voir dire in stating that no member of her family had been a victim of

24   homicide and "no rational trier of fact could find otherwise").

25    The trial court's determination that Juror No. 6 merely failed to recall that he had

26   "probably" read newspaper articles about the case prior to leaving town two months prior was

1   also reasonable.  It is not difficult to imagine the possibility of forgetting about a newspaper

2   article read months prior.  *C.f. Green v. White*, 232 F.3d 671, 676 (9th Cir. 2000) (finding in

3   contrast that it was difficult to imagine that a juror could have forgotten about six months he

4   spent in the brig for a past assault).  It is also not an unreasonable conclusion that Juror No. 6 did

5   not immediately recognize petitioner and that he only made the connection after being seated on

6   the jury, going home for the day, and reflecting on the matter.  It appears from the record that

7   Juror No. 6 came forward of his own volition first thing the morning after the jury was seated to

8   inform "someone on the [court] staff" of his familiarity with petitioner and the case being tried,

9   which led to the in-chambers proceedings set forth above.  (RT at 25.)  The fact that Juror No. 6

10  came forward on his own to correct his previous omission supports an inference that the

11  omission was unintentional and not purposeful dishonesty.

12          Jurors, the Supreme Court has recognized, "cannot be expected invariably to

13  express themselves carefully or even consistently."  *Skilling v. United States*, 130 S. Ct. 2896,

14  2925 (2010) (quoting *Patton v. Yount*, 467 U.S. 1025, 1039 (1984)); *see also Yount*, 467 U.S. at

15  1040 ("It is here that the federal court's deference must operate...")  As set forth, bearing directly

16  on the analysis of this claim, the trial judge's finding that Juror No. 6 was not biased is presumed

17  correct on federal habeas corpus review.  For the reasons discussed, petitioner fails to overcome

18  this presumption of correctness.  The state court's ruling that Juror No. 6's omission was

19  unintentional and that he could be a fair and impartial juror was not based on an unreasonable

20  determination of the facts in light of the evidence, nor was rejection of the claim contrary to, or

21  an unreasonable application of clearly established federal law.

22
23          B.      Ground Two: Juror Misconduct and the Trial Court's Denial of the Motion
                    for Mistrial

24          In another claim premised on Juror No. 6's conduct, petitioner asserts that

25  misconduct during deliberations deprived him of his rights guaranteed by the Fifth and Sixth

26  Amendments and the Due Process Clause.

Two days into deliberations, the jury foreperson sent a note to the court that "One juror went online and looked up the medications[.] [I]s it compromised[?]"  (Clerk's Transcript ("CT") at 267.)  In response to the court's inquiry, the foreperson reported it was Juror No. 6 who had done so.  Outside the presence of the other jurors, the court and parties questioned Juror No. 6 under oath.  Juror No. 6 denied having done internet research, but stated that he had looked at the labels of his wife's Ibuprofen and other pill bottles to see what they said and, in particular, whether they were considered lethal drugs.  Juror No. 6 explained the foreperson's allegation of internet research and the following exchange took place:

> [JUROR NO. 6]: ...the Internet came in because I said, "You could do, probably an Internet" – "an Internet search and come up with all kinds of things on this stuff." [¶] But I said, "You know, I'm on the Internet all the time."  But I did not look up specifically what is lethal, what is this.  Because questions came up what is 142.5. [¶] I have all kinds of questions on that.  What does toxicity mean.
>
> THE COURT: Did you look up those things?
>
> [JUROR NO. 6]: No. [¶] I'm still not clear on 142.5 means on it [sic].
>
> THE COURT: Are you talking about the toxicology report?
>
> [JUROR NO. 6]: During the testimony somebody said, "142.5." [¶] And I said, "What the hell is 142.5," on a scale of what and where does it become bad?  I have no idea.  [¶...¶]  We were discussing the [attempted murder] charge.
>
> THE COURT: Okay.

(RT at 708.)

Juror No. 6 further reported that he told the other jurors, based on looking at pill bottles at home, that "there's inconsistencies in adverse effects," and that they should all read the labels on the pill bottles that were in evidence.  Another juror immediately replied that there was not supposed to be any outside research.  According to Juror No. 6, a verdict had already been reached on count III (infliction of corporal injury) and count IV (criminal threats) before he went home and looked at his wife's medication.

13

1   Juror No. 10, the foreperson, also testified.  (RT at 714-22.)  She stated "I believe

2   he said he went online to look up certain medications"; it was "after he made that comment" that

3   he said "we should look at those labels, indicating the labels on the exhibits."  (RT at 715.)  Juror

4   No. 10 testified:

5   Well, we were – we were talking about the medications and about
    how long we thought that it would be before they would be fatal.

6   We didn't know.  And he stated that he thought that the
    medications that he looked up would not be fatal in the time frame

7   that we believed she was at the house, and that's – he didn't think –
    he didn't believe that the medications were, he thought, enough to

8   kill someone.

9   (RT at 716.)  Juror No. 10 confirmed that other jurors had quickly stopped Juror No. 6 from

10  further discussing the specifics of his findings.  The jury stopped deliberating and sent a note to

11  the court.  Juror No. 10 also confirmed that the jury had reached verdicts and signed the forms on

12  counts III and IV before any misconduct occurred.

13   The court questioned the remaining jurors.  (RT at 717-56.)  Questioning of the

14  other jurors confirmed that the extent of the conversation about extraneous information was as

15  reported by Juror Nos. 6 and 10.  Some of the other jurors said they thought Juror No. 6 had

16  stated that he did Internet research at some point.  All the jurors indicated unequivocally that

17  Juror No. 6's comments did not affect their personal opinion of the evidence and that they could

18  remain fair and impartial.

19   The court stated: "Notwithstanding [Juror No. 6]'s behavior...  I'm inclined at this

20  time to bring the jury in; take the verdicts that they have, whatever findings they have, depending

21  what the verdicts are; and declare mistrials, as to Counts I and II..."  (RT at 757.)  Counsel for

22  both parties indicated no objections.  The court clarified that it was accepting the verdicts on

23  counts III and IV because those verdicts had been reached and signed before Juror No. 6 looked

24  at the pill bottles and before he mentioned his outside research to the other jurors.  Sometime

25  later, defense counsel made an objection for the record that taking partial verdicts "may cause

26  double jeopardy issues" and "may cause confusion"; the objection was overruled.

14

1    Following some proceedings (discussed *infra* in subsection C), the trial court

2    polled the jurors on the verdicts on count III (infliction of corporal injury) and count IV

3    (threatening to commit a crime).  All 12 jurors indicated their agreement with the verdicts.  The

4    court declared a mistrial on the remaining counts and allegations.

5    On direct review, the California Court of Appeal disagreed with petitioner's

6    contention that he was entitled to a new trial because of Juror No. 6's misconduct.  The court

7    held, in relevant part:

8    [D]efendant has not carried his burden to prove prejudice either
      because of state error or federal error relating to the alleged juror
9    misconduct. In our view, most telling is the overwhelming
      evidence against defendant as to the counts for which he was found
10   guilty. As to the infliction of corporal injury on a spouse, P. had
      numerous bruises all over her body, including her neck, wrists,
11   arms, and face. It was clear those injuries were not caused by an
      alleged suicide attempt, hospital treatment, or any other source
12   except defendant's violent attack on her that consisted of kicking
      her in the face, hitting her on the forehead, and dragging her around
13   the house while bound. As to the criminal threats, defendant made
      numerous statements indicating that he would harm or kill her,
14   including, " 'Tonight's the night you're going to die, bitch,' " that
      he would stab her one time for every pill she spit up, that he would
15   throw hot grease on her face, and that he would stab her if she tried
      to get away. Furthermore, defendant's admission that he "'fucked
16   up'" and his apologies to her following the pretext call belied
      defendant's claim that P. was trying to commit suicide.

17
      Given the state of the record refuting any claim of bias harbored by
18   Juror No. 6 and the evidence at trial, defendant was not prejudiced
      by the events relating to Juror No. 6.
19

20   *People v. Smith*, *supra*, at 6-7.

21   "Evidence developed against a defendant must come from the witness stand."

22   *Fields v. Brown*, 503 F.3d 755, 779 (9th Cir. 2007); *see also Turner v. Louisiana*, 379 U.S. 466,

23   472-73 (1965).  If a jury breaches its duty to decide the case based solely on the evidence

24   introduced at trial by considering extraneous facts not introduced in evidence, the defendant has

25   effectively lost the rights of confrontation, cross-examination, and the assistance of counsel as to

26   the extraneous evidence being considered by the jury.  *Turner*, 379 U.S. at 472-73; *Hughes v.*

15

1  *Borg*, 898 F.2d 695, 699 (9th Cir. 1990) (quoting *Gibson v. Clanon*, 633 F.2d 851, 854 (9th Cir.

2  1980)).

3          "Once a juror has breached [the duty to consider only evidence presented in open

4  court] by infecting the deliberations with extrinsic material, a new trial is warranted if there is a

5  'reasonable possibility' that it could have affected the verdict." *Bayramoglu v. Estelle*, 806 F.2d

6  880, 887 (9th Cir. 1986), *cert. denied*, 456 U.S. 962 (1982) (quoting *Fahy v. Connecticut*, 375

7  U.S. 85, 96-87 (1963); *see also Hughes*, 898 F.2d at 700 (quoting *Marino v. Vasquez*, 812 F.2d

8  499, 504 (9th Cir. 1987).  "The 'reasonable probability' test is equivalent to the harmless error

9  rule for constitutional errors." *Bayramoglu*, 806 F.2d at 887 n.7 (citing *United States v. Bagley*,

10  641 F.2d 1235, 1241 (9th Cir. 1981); *Estrada*, 512 F.3d at 1235 (distinguishing between case

11  where jury considered extraneous information, which is subject to harmless error analysis, and

12  case where a juror is biased, which is structural error).  In evaluating whether extrinsic

13  information prejudicially affected the deliberations, a court should consider factors such as

14  whether and how the extrinsic material was received, the length of time it was available to the

15  jury, the extent the jury discussed and considered it, the point in the deliberations that it was

16  introduced, and any other relevant matters which bear on the issue whether the extrinsic material

17  substantially and injuriously affected the verdict.  *See Mancuso v. Olivarez*, 292 F.3d 939, 951

18  (9th Cir. 2002) (citing *Bayramoglu*, 806 F.2d at 887 and *Brecht v. Abrahamson*, 507 U.S. 619,

19  623 (1993)).

20          "The ultimate question is whether it can be concluded beyond a reasonable doubt

21  that extrinsic evidence did not contribute to the verdict." *Bayramoglu*, 806 F.2d at 887 (internal

22  quotations omitted).  Juror misconduct is harmless if "the other evidence amassed at trial was so

23  overwhelming that the jury would have reached the same verdict even if it had not considered the

24  extraneous material." *Hughes*, 898 F.2d at 700 (citing *United States v. Bagnariol*, 665 F.2d 877,

25  887 (9th cir. 1981), *cert. denied*, 456 U.S. 962 (1982)).

26  /////

Here, as discussed, Juror No. 6 conducted outside research and apparently concluded that Tylenol or similar medication was not strong enough to kill someone in the relevant time frame.  As petitioner conceded in his state court filings, the research was not inherently prejudicial because this fact, if true, would actually assist his defense on the attempted murder count.

The trial court conducted a thorough and detailed inquiry into Juror No. 6's misconduct.  This included the questioning of each juror under oath.  Examination of the jurors revealed that the extrinsic material in question was briefly introduced only one isolated time, and that any discussion it prompted died quickly when other jurors said that they should not be talking about the subject.  More importantly, because examination of the jurors revealed that verdicts on the two counts of conviction had already been reached (and signed) before the misconduct occurred, deliberations on those counts could not have been influenced.  Finally, as the state appellate court explained, the evidence against petitioner on these counts was significant.

Under these circumstances, the state appellate court's determination that Juror No. 6's misconduct was harmless beyond a reasonable doubt is consistent with, and reasonable application of relevant Supreme Court precedent.  No reasonable possibility exists that Juror 6's brief comments about pill bottle labels and medicine toxicity substantially and injuriously influenced the jury's verdicts finding petitioner guilty of infliction of corporal injury (count III) and threatening to commit a crime (count IV).  *See Fahy*, 375 U.S. at 86-87.

C:      Ground Three: Unanimity, Jury Polling, and Irregularities in the Taking of Verdicts

Following the court's overruling of the defense objection to the taking of the verdicts, the jury returned all verdict forms to the court.  The court noted that the jury had not made any finding as to the great bodily injury special allegation attached to count III, but that the jury had filled out one of the special enhancement forms for count I, even though the jury had

previously indicated it made no finding of guilt or innocence on count I.  In response to the

court's inquiries, the foreperson indicated that the form relating to count I "was a mistake."  (RT

at 772.)  The court then asked the foreperson to "fill out the correct form right where you're

sitting, and make a note, sign it today's date, and make a note on the form when that decision

was made."  (RT at 772.)  After the foreperson returned the verdicts, the court noted:

> We're back where we started... [¶]...[¶] The jury foreman had filled
> out Count I, special allegation verdict, great bodily injury inflicted,
> or did inflict, and also special allegation to Count I, premeditation
> and deliberation. [¶] Those are the two that are filled out.

(RT at 773.)  The court again explained that the jury had previously indicated it had not reached a

verdict on count I, and that it *had* reached a verdict on count III (corporal injury to a spouse) and

its accompanying special findings.  (RT at 773.)  The court directed the foreperson to make an

entry on the verdict form reflecting the jury's unanimous decision on the special allegation *as to*

*count III*.  The court addressed the foreperson once again:

> I'm going to ask you again if you'll go through the forms and mark
> on the appropriate form for Count III the jury's finding that was
> made yesterday.
>
> Please put on today's date.  But somewhere on there, write the fact
> that the decision was made yesterday, December 20.  Make sure it
> says Count III.

(RT at 776.)  And further:

> What I want you to do is mark down the decision [ ] that was made
> yesterday, if it was made yesterday; date it today; sign it; and
> somewhere on there notate it that this vote or this decision was
> made on December 20, 2007.

(RT at 777.)

The court then read the entry, which stated in relevant part: "We the jury... find...

the Defendant Konolus Smith did not inflict great bodily injury on the victim..." (RT at 778.)

The court proceeded to poll the jury on the counts of conviction and the special allegation.  Juror

No. 1 indicated that the verdict forms had been signed incorrectly, and that the jury "had not

come to a complete decision" as to the great bodily injury finding.  (RT at 780.)  The court noted that a number of jurors were nodding in agreement that a decision had not been reached as to the special allegation.

Because of the confusion, the court considered out loud discharging Juror No. 6 for misconduct, bringing in the alternate juror, and then allowing the jury to begin deliberations "from scratch."  Following a defense objection, however, the court reversed course, stating: "I'm going to go back.  I'm going to poll the jury, as to your verdicts as to counts III and IV, period.  And I will not discuss the special finding..."  (RT at 781.)

The court asked Juror No. 1, "[A]re these your verdicts as to counts III and IV?"  Juror No. 1 answered, "No."  The court stated: "The forms indicate that the jury has found Mr. Smith guilty of Count III, spousal abuse; guilty of Count IV, criminal threats. [¶] [Juror No. 1], is this your verdict as to those two counts?"  This time, Juror No. 1 answered "Yes, sir. It is."  (RT at 781.)  After the other 11 jurors were polled and also answered in the affirmative, the court entered verdicts as to counts III and IV and declared a mistrial on the special allegation.

Petitioner asserts that the jury's deliberations were incomplete, not unanimous, and that the court coerced Juror No. 1 into agreeing with the verdicts.  On direct review, the California Court of Appeal rejected petitioner's claim of error:

> Defendant claims the jury's deliberations on counts III and IV "were not complete," so the trial court erred in taking the verdicts. This claim is overly broad. The record makes clear that deliberations only on count III's special allegation of infliction of great bodily injury were incomplete when the court took the verdicts. The declaration of a mistrial on the special allegation resolved the issue favorably to defendant, so there was no prejudice to defendant.
>
> Defendant's claim that the verdicts were not "entirely unanimous," so the court erred in taking the verdict, also fails. This claim is based on Juror No. 1's "No" answer to the court's question, "are these your verdicts as to counts III and IV?" The court correctly perceived that Juror No. 1 had not understood that, unlike the inquiry moments before, the court's present inquiry did not include the special allegation on count III. When the court clarified, "The forms indicate that the jury has found [defendant] guilty of count

III, spousal abuse; guilty of count IV, criminal threats," Juror No. 1 indicated that this was the jury's verdict. The ensuing inquiry revealed that the verdicts on counts III and IV were unanimous.

Finally, defendant's claim that the court's statements about discharging Juror No. 6, seating the alternate juror, and restarting deliberations "in effect coerced" one or more jurors into agreeing with the verdicts on counts III and IV also fails. This claim assumes that the jurors had not resolved counts III and IV, and posits they falsely announced their agreement with the verdicts to avoid the prospect of renewed deliberations. But as we have explained, it was only the count III special allegation that had not been resolved. The court's statements were not coercive as to counts III and IV because at the time the court made those statements, the jury had already reached a decision on those counts. There was no prejudice.

*People v. Smith*, *supra*, at 8.

At the outset, it is noted that the Sixth and Fourteenth Amendments of the United States Constitution neither compel nor prohibit state requirements that jury verdicts be unanimous. *Johnson v. Louisiana*, 406 U.S. 356, 359, 363 (1972); *Apodaca v. Oregon*, 406 U.S. 404, 411-12 (1972). In any event, the record does not support petitioner's allegation that the verdicts were not unanimous. Nor does the record support an allegation that the verdicts were incomplete when taken. In sum, for the reasons set forth by the state appellate court, it is clear that each juror found petitioner guilty of both counts of conviction (counts III and IV) beyond a reasonable doubt, despite the initial confusion on this issue.

Petitioner's claim that the trial judge coerced Juror No. 1 into agreeing with the verdicts also fails. On some occasions, the Supreme Court has reversed convictions for a trial court's perceived coercion of the jury into reaching a verdict. *See, e.g.*, *Jenkins v. United States*, 380 U.S. 445, 446 (1965); *United States v. United States Gypsum Co.*, 438 U.S. 422, 459-62 (1978). The test for jury coercion by a trial judge is "whether in its context and under all the circumstances of this case the statement was coercive." *Marsh v. Cupp*, 536 F.2d 1287, 1290 (9th Cir. 1976). Whether the comments and conduct of a state trial judge infringe upon a defendant's due process rights turns on whether "the trial judge's inquiry would be likely to

1   coerce certain jurors into relinquishing their views in favor of reaching unanimous decision."

2   *Locks v. Sumner*, 703 F.2d 403, 406 (9th cir. 1983).  Here, the trial judge's inquiry could not

3   have coerced Juror No. 1 into relinquishing his views in favor of reaching a unanimous decision;

4   as discussed, a unanimous decision had already been reached.  The judge was merely questioning

5   Juror No. 1 in the face of an apparent misunderstanding about the verdict forms.

6          The state court's factual determinations relative to this claim were all supported

7   by the record.  The California Court of Appeal's rejection of this claim was not contrary to, or an

8   unreasonable application of clearly established Supreme Court precedent, nor based on an

9   unreasonable determination of facts.[4]

10         D.      Ground Four: Alleged Sentencing Error and Denial of the *Romero* Motion

11         Prior to sentencing, and pursuant to *People v. Superior Court (Romero)*, 13

12  Cal.4th 497 (1996),[5] petitioner moved to dismiss one or both of his prior serious felony

13  convictions that were alleged for sentence enhancement purposes.  Both prior felony convictions

14  arose from a single incident in 1973, when petitioner and two co-defendants entered a grocery

15  store to rob it.  One co-defendant shot and killed an employee; the other co-defendant shot and

16  wounded another.  Following his 1981 parole, petitioner lived a crime-free life until he

17  committed the instant offenses.  The trial court denied the *Romero* motion, finding that

18  petitioner's case was not one that fell outside the spirit of the state's habitual criminals or "three

19  strikes" law (*see* Cal. Penal Code §§ 667(b)-(i), 1170.12(a)-(d)).  Petitioner claims that the trial

20  court erred in violation of his due process rights when it denied his motion.

21

22         [4] As the California Court of Appeal observed, the trial court allowed the proceedings in
    this case "to get out of its control."  *People v. Smith*, *supra*, slip op. at 1.  "In the end, though, the

23  contentions [ ] raise[d] have no merit."  *Id*.  In the same vein, it bears repeating here that "[a]
    defendant is entitled to a fair trial but not a perfect one, for there are no perfect trials."  *Brown v.*

24  *United States*, 411 U.S. 223, 231-32 (1973) (internal quotation omitted).

25         [5] Pursuant to the holding of the California Supreme Court in *Romero*, a trial court has
    statutory discretion under Cal. Penal Code § 1385(a) to dismiss prior serious felony convictions

26  alleged for sentence enhancement purposes, even in the absence of a motion requesting that
    action by the prosecuting attorney.

1    This claim relates solely to the application of a state sentencing law .  Absent

2    fundamental unfairness, federal habeas corpus relief is not available for a state court's

3    misapplication of its own sentencing laws.  *Estelle v. McGuire*, 502 U.S. 62, 67 (1991); *Brown v.*

4    *Mayle*, 283 F.3d 1019, 1040 (9th Cir. 2002), vacated on other grounds, 538 U.S. 901, remanded

5    to 66 F. App'x 136 (9th Cir. 2003) ("The district court correctly concluded that this state law

6    [*Romero*] claim is not cognizable on federal habeas review."); *Christian v. Rhode*, 41 F.3d 461,

7    469 (9th Cir. 1989) (petitioner not entitled to habeas relief on claim that state court improperly

8    used prior federal offense to enhance punishment); *Miller v. Vasquez*, 868 F.2d 1116, 1118-19

9    (9th Cir. 1989) (claim that prior conviction was not a "serious felony" under California

10   sentencing law not cognizable in federal habeas corpus proceeding).  On this record, no

11   fundamental unfairness appears and petitioner is not entitled to relief.

12                                    VI.  CONCLUSION

13           For all the foregoing reasons, IT IS HEREBY RECOMMENDED that the

14   application for writ of habeas corpus be DENIED.

15           These findings and recommendations are submitted to the United States District

16   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within twenty-

17   one days after being served with these findings and recommendations, any party may file written

18   objections with the court and serve a copy on all parties.  Such a document should be captioned

19   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

20   shall be served and filed within seven days after service of the objections.  Failure to file

21   objections within the specified time may waive the right to appeal the District Court's order.

22   *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir.

23   1991).

24   DATED: July 26, 2011

25                                    CHARLENE H. SORRENTINO
                                      UNITED STATES MAGISTRATE JUDGE

26